Stephanie Conley, Connie Wright, Robert Schultz, Jason Kirk, Scott Engren, David Crafton. Or argument as follows, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Cannon for the plaintiff appellant. Good morning. Good morning. May it please the court, opposing counsel. My name is Dan Cannon. It is my great pleasure to be here representing Mr. Dax Womack who is present in the courtroom. I have reserved three minutes for rebuttal. Thank you. This is a case that has an extensive history at this point involving both criminal proceedings at the state level and civil proceedings below, obviously. And I think though that for purposes of today and for purposes of this court's review, the simple issue to focus in on is the application or rather the misapplication in this case of the standard of review or the various standards of review that are at work. Mr. Womack is a respected criminal defense attorney that practices in the Owensboro, Kentucky area. And in his capacity as a criminal defense attorney, he has had the occasion to cross swords on numerous occasions with Detective Matt Connelly, who works with the Kentucky State Police. At the time leading up to Mr. Womack's arrest, he was attempting to work out a deal wherein his client's mother, who is the appellee Connie Knight, would act as an informant for law enforcement in order to get a better deal for her son, who was Mr. Womack's client, who was facing a lot of prison time. And this is the sort of deal that he had worked out, that Mr. Womack had worked out with law enforcement in the past. Now three to four weeks before Mr. Womack was arrested by Mr. Connelly, Ms. Knight had visited Mr. Womack in his office asking about the drug buy idea, asking about acting as an informant, and showed up actually with a package of pills. And Mr. Womack took those pills, threw them away, and kicked Ms. Knight out of his office. And that is something that is uncontested by all parties. Now after that, somehow, and we're at the defense's mercy as to how this exactly occurred, but somehow Ms. Knight connects with Mr. Connelly and is then asked to act as an informant against Mr. Womack. She's wired up and then begins to call Mr. Womack constantly about the drug buys that they had discussed before. There's undisputed testimony to the effect, or evidence to the effect, that Ms. Knight had called Mr. Womack 18 times before he ever answered the phone to speak with her. She's calling him repeatedly on the day that he was arrested and in the days leading up to that. She's also asking him during this time for money to cover her bills since he threw her drugs away on a prior occasion. Finally, on April 9th, she comes to his office and during a discussion about her son's case, they're not discussing pills, they're not discussing a drug buy, they're not discussing anything. They're discussing her son's case specifically. She takes a call that we now know was on her cell phone. She takes a call that we now know was a call from Detective Connelly. And that audio is mysteriously missing. So now, again, this is evidence that's in control of the defense, obviously. So they have her wired up and the representation is made by Connelly during the grand jury proceedings and the preliminary hearings that, or during the grand jury proceedings rather, that the audio and video was working perfectly. Well, that audio is gone. We don't know the specific contents of that call. And that's important because it figures into the district court's evaluation of the facts below. What we do have is a video that shows Mrs. Knight throwing a package of drugs onto Dax Womack's desk. And this happens directly after the phone call with Detective Connelly. So she gets the call, she's on her phone, throws the pills onto Mr. Womack's desk, and then the next thing that happens is Connelly and Ingram are kicking the door down and they come in and arrest Mr. Womack without a warrant. Mr. Womack is charged with two counts of drug crimes until two months later, right before the preliminary hearing, he subpoenas Detective Connelly's wife to testify at the preliminary hearing, and then all of a sudden six more charges, three felonies and three misdemeanors, show up. All of those charges, and this is important as well, all of those charges except for one were dismissed before Mr. Womack's criminal trial and that one charge he was acquitted on. That is our case. It is a straightforward framing of a defense lawyer. And in this case, the trial court has misapplied the standard of review, especially with regard to probable cause determinations and to the civil conspiracy theory. And I'd like to talk about probable cause first, and I think on that topic specifically there are three basic reasons why this court should reverse the district court. And the first, and perhaps the most obvious, that continues to be overlooked by the appellees and was overlooked we believe by the district court, is that seven out of eight of those criminal charges against Mr. Womack were dismissed, and six of them because they lacked probable cause. And these are the charges that were heaped on Mr. Womack after he tried to subpoena Stephanie Connolly to testify. The second reason is that the opinion below is focused on recordings that Ms. Knight took between Mr. Womack and herself talking about pills and talking about drug buys and a whole host of various other things. Those recordings are taken out of context, but for these purposes the important thing is that those recordings that the trial court uses to base its determination of probable cause on occurred prior to the alleged commission by Mr. Womack of any felony and prior to any Fourth Amendment activity that is involved in our 1983 claim in this case. So the question here is that we've got a warrantless entry, we've got a warrantless arrest, and is that reasonable under the facts and circumstances? Is that reasonable under the Fourth Amendment? And the question that the court below is obligated to answer is, was there probable cause, knowing what these officers knew at the time, to believe that a crime was being committed such that they can come into Mr. Womack's office and arrest him and subsequently prosecute him for that? Now, of course, we think the answer to that question is no because we think that the officers conspired to frame him. But I think where the lower court misses the boat on this is that we don't have to prove at this stage that there was no probable cause. We simply have to prove a genuine issue of material fact on probable cause, such that it could be submitted to a jury. And we think we've done that, and we think we've done it handily, in fact. And here's why. We've got a contemporaneous phone call between Ms. Knight and the KSP detective that has already documented animosity between him and Mr. Womack. We have missing audio from which I think, under the circumstances, it's fair to infer that there was a call from Detective Conley to Ms. Knight that says, We're coming in. Ditch the drugs. They're not talking about drugs. They're not saying anything about anything. Ms. Knight gets a phone call, throws the drugs on the desk, and in come the police. I think it's fair, since the defendants had control of this audio and it's now missing, I think it's certainly reasonable to infer that she threw those drugs on the desk at the direction of KSP. And even if she didn't, it would be an illegal action on her own for which she at least ought to be liable. And the other reason is the simple fact of the warrantless entry in the first place. If probable cause for Mr. Womack's arrest and prosecution had already existed at the time that Ms. Knight entered his office on April the 9th, why was there no warrant issued for Mr. Womack's arrest before the police got there? And the answer, in our view, is obviously that if Ms. Knight had shown up with drugs again, like she had in the past, that Mr. Womack would have kicked her out again. And KSP knew that under these circumstances, and that's the only thing that makes sense. They're trying to catch him in the act. That's the only way they can get him. So if we get him during the commission of a crime, we don't have to issue an arrest warrant. We don't have to pre-establish probable cause with the evidence that we have. And, of course, there is also the video. And the problem with the lower court's evaluation of this video is that they say, as Judge Russell says, that it is inconclusive as to what happens. It doesn't support either side. Well, we respectfully disagree with that, but even if we didn't disagree with it, under Rule 56, that fact should be construed in our favor. It's always been our position that that video is strong probative evidence that Ms. Knight threw the drugs on Dax Womack's desk. And if it's a little unclear and if it's difficult for the court to see, it may be interesting to know that this was, at least in our opinion, the basis of Mr. Womack's acquittal on that one charge in the court below. And what they had to do there was to hire a video specialist to blow up the video and slow it down frame by frame. And then it becomes very, very clear what is going on. Ms. Knight throws the drugs on his desk. And that's where the inquiry should end, frankly. The only basis for probable cause underlying Mr. Womack's warrantless arrest was manufactured. You can tell that by the video alone. But at least we've raised a genuine issue of material fact that would be worthy of submission to a jury. The other issue is the one of collateral estoppel, but I believe that's adequately covered in our brief, and I'm running short on time. That's covered by the Dara and Henchman line of cases, and I have been unable to find any supporting case law from anywhere that says grand jury proceedings ought to apply as collateral estoppel to a subsequent 1983 action. It's comparing apples to oranges. The argument that these appellees have made up until this point is that even if probable cause is manufactured, if the officers have made it sufficiently appear as though there was probable cause, then they should be absolved of liability. And that worked at the trial court level, but it's not the law. We still get to a jury under these facts, and that's clear from Gregory v. Louisville, from the Dara case, from Henchman, from that entire line of cases. I see that I'm running out of time. If there's no questions, I'll reserve the remainder of my time for rebuttal. Okay. Thank you, Mr. Cannon. Good morning, Your Honors. Good morning. I'm Jason Bell. I represent Matt Conley. We have informed the clerk. We've decided to split our time if it pleases the court. Six minutes for me, six minutes for Mr. Nunry, and then three if there are any other defendants that need to address. We have five defendants, if that's okay. That's fine. Very quickly, the issues are conspiracy, probable cause, collateral estoppel immunity. On the conspiracy issue, they have to show a single plan or shared conspiratorial objective and an overt act. If their conspiracy theory were to ring true, then many in the western Kentucky law enforcement community would have had to been in on this. This was not some personal vendetta between Matt Conley and Dax Womack. The Henderson City Police were involved. Henderson County were involved. Davis County were involved. Desi West, which is a drug enforcement arm of the state police, were involved. Later, of course, prosecutors screened this case. They went to the local Commonwealth attorney, Bill Markwell, and got his blessing to proceed with this pre-arrest. So this is not some personal vendetta or conspiracy as they would have you believe. Another key point on conspiracy, Your Honors, is that this did not originate with the Kentucky State Police. This originated by a lady named Carmella Blythe, who is an informant, who talked to Preston Herndon, who is a Henderson City Police officer. So the conspiracy was not even hatched. Their theory is that the state police conspired to arrest Mr. Womack. It didn't even originate with the Kentucky State Police. The testimony and also some audio that we have in this case is clear. Conley has said over and over, I didn't want this case from the beginning. I think that's almost an uncontroverted fact. He knew Mr. Womack. He thought it would be best if he just didn't handle it. He sees him in court occasionally, and he didn't even want the case. So not only is it not a personal vendetta, he had no desire to take the case. The issue of animus or animosity between these two is ridiculous. The post-arrest audio is the most compelling proof that we have. There's a conversation between Dax Womack, and we would encourage the court to please listen to that, between Dax Womack and Matt Conley. And Mr. Womack himself says, I want to talk to you friend to friend. So not only was there no animosity, apparently Mr. Womack considered him a friend. This issue of conspiracy, they cite the general order of the Kentucky State Police. I think we all know that those are constitutionally insignificant. We don't think it was breached. There is a mention of a payment of $300 to a confidential informant. That's standard procedure. Ms. Knight's testimony is she didn't even know she was being reimbursed for her travel and expense before. So that could not have been the motive for her coming forward. They talk about, this morning they talked about adding those six charges. That was done by the prosecutor. Todd P. Poole is the Hopkins County attorney. He has an affidavit in the record where he says that was my decision to add those charges. Matt Conley, as a state trooper, does not have the authority to add charges in the middle of a criminal prosecution. And they're trying to pin that on the Kentucky State Police. Then there are all these allegations that Conley lied and Conley lied, and we would point this court to the Rayburg case, the U.S. Supreme Court case, and also the Vaughn v. City of Shaker Heights case. We do not believe for one minute that Mr. Conley lied, but those cases stand for the proposition that grand jury testimony, preliminary hearing testimony, has absolute immunity. So he didn't lie, but even if he did, immunity would apply to protect those statements. And then the issue of probable cause. I would ask the court, oh, one other thing before I leave conspiracy. This cell phone call, the testimony, the uncontroverted testimony from both Knight and from Conley, is that he simply called and the audio failed. He couldn't hear, so he asked, has Mr. Womack taken possession of the drugs? She says yes, and they come in. And the testimony from the officers from two different law enforcement agencies, not just the state police, but Officer Ingram from, I believe, Davis County was there as well, is that the drugs were inside the drawer. Zach Womack, Mr. Dax Womack's father, later testified that the drugs were in the drawer as well. Now, turning to the issue of probable cause, this court knows it's a very low threshold. It's something less than, certainly less than reasonable doubt, less than preponderance of the evidence. It really is just a reasonable belief that criminal activity is afoot. So we have to, and we also have to look at it, we can't apply the hindsight principle. We have to look at what Detective Conley knew at the time. I think we can apply the hindsight principle. It looks perfectly reasonable to me here in Cincinnati now. But if you look at what he knew at that time, he had every reason to believe that Mr. Womack was engaged in criminal activity. The best testimony on that is from Dax Womack himself. The post-arrest audio conversation between Dax Womack and Matt Conley, he says to Matt Conley, I know how this must look. I know how this must look. He's basically saying, I realize this looks like I'm engaged in criminal activity. So even his admission there. His admissions pre-arrest to Connie Knight, he asks her, what does that old dude have now? That's the drug source. He tells her to take the drugs and put them in his little mail slot in his office door. They quote a price, $50. He goes and gets $50 cash. He gives Connie Knight $50 cash. He tells her to tell the drug source to hold the drugs, to hold these pills. He asked about a prior drug, OxyContin, and said he would prefer that. Those admissions are damaging on the probable cause issue. There is overwhelming proof of probable cause here. Mr. Conley and the KSP would have been irresponsible not to pursue this investigation. Our opinion and my time is running short, but probable cause was conclusively established at the preliminary hearing, at the grand jury, and at the motion to suppress in the underlying case. I'll leave the issues for collateral estoppel, immunity, et cetera, for other counsel to address. Okay. Thank you, counsel. May it please the court. My name is Dave Nunry. I represent Captain Schultz and Sergeant Kirk in this action. It's going to be hard not to be a little bit redundant as to a few things Mr. Bell said, but I'll try to avoid that as much as I can. I do want to start by talking about the issue of probable cause. This whole scenario actually began when Ms. Knight and Mr. Womack began talking, as Mr. Bell indicated, about some way that she could help her son perhaps by becoming a confidential informant, but he was going about it in a way that was kind of unusual. Ms. Knight had a friend named Carmella Blythe, who was at that time a confidential informant. She shared with Ms. Blythe these things that were going on between herself and Mr. Womack, and Ms. Blythe said, that doesn't seem right. And she went to her detective that she worked with as a CI, who was Preston Herndon, a detective with the city of Henderson, and Mr. Herndon agreed, this does not seem to be right. So he took that to the Kentucky State Police, to Detective Conley, who was the narcotics officer at Post 16. Once the state police were made aware of this improper conduct with Mr. Womack, they didn't have a choice about whether or not to investigate it. They're charged with the responsibility of investigating crimes that are brought to their attention, and they had no choice but to investigate it. They had several conversations. They interviewed Ms. Knight a couple of times. They felt that what she was telling them was truthful and had merit. So they arranged for her to be wired and to go talk to Mr. Womack with audio and video wires. She was strip searched both times she went. Every measure was taken to ensure the accuracy of what was taking place with those tapes, and those tapes is what this case is about. Those tapes clearly, when you look at what was said, the statements particularly that Mr. Bell referred to, there's no doubt that Mr. Womack, whatever his intentions were, he was portraying himself as someone who was willing to obtain oxycodone in this case and have Ms. Knight purchase it on his behalf. He gave her $50. After discussing the price, she did bring back the oxycodone. He wanted her to put it through a mail slot, but she said, no, I'll have to bring it to you in person, and she did. And that's when she was arrested. So this whole situation concerning Mr. Womack did not originate with the state police. It was brought to the state police. And as Judge Russell observed, this was a proper investigation. It's what the state police do when they're brought that type of evidence. Lieutenant Colonel Joe Williams, a retired state police officer of obviously high rank and very involved in drug enforcement activities and writing of some of these general orders and so forth, has testified in a deposition, and here's what he said about this. And he was talking about this general order OMC 6, which Mr. Womack alleges was violated by the state police. Actually, OMC 6 has nothing to do with the case of this nature. OMC 6 has to do with major traffickers, trafficking organizations, peripheral offenders, who are people that are insulated from direct involvement in the criminal acts, but whose financial or other support facilitates the continuation of criminal acts. These major operations are what are targeted by the language of OMC 6. It's not meant to deal with this kind of a pretty minor deal, really, $50 for purchase of a few oxycodone pills. Here's what, though, Lieutenant Colonel Joe Williams said, and I'm quoting from his deposition, the overarching concern for us in this case is this corruption issue with the attorney. It's not the drug case. It's the fact that this attorney has violated the trust that he is supposed to have and sent this woman out to do an illegal act. This was all entirely within correct police procedures. Now, probable cause. There was a preliminary hearing in front of a special judge. The transcript is 99 pages long. It was obviously an involved hearing. The entire tapes were made available to the judge. He has said that in his opinion. He was also aware that some editing had occurred prior to the hearing. That was discussed on the record. What is also important about that preliminary hearing is Mr. Womack was well represented by counsel, but no objection was made to these tapes at that hearing. Now, so probable cause was found at that point. Actually, prior to that, Mr. Pupul, the prosecutor, had made a determination that there was probable cause, so it went on to the preliminary hearing stage and then went on to the grand jury stage. The grand jury hearing was extensive. Zach Womack, Mr. Womack's father, who is also an attorney, testified at the grand jury, and he testified exactly the same theory that Mr. Womack is putting forth in this case. He testified to the grand jury about the concealment, what Judge Russell referred to as the delivery method of the drugs. How did they get from this night to Mr. Womack? He talked about the theory that Zach Womack has. The grand jury still found probable cause. As a matter of fact, when you look at what the grand jury said, they're incredulous. They listened to the tapes, and they're saying, did he really say that? And one of them is saying, that's what I heard him say. That's what he said. They were incredulous that this attorney would be involved in this kind of a thing. So the grand jury Your time has expired. Do you wish to use some of the remaining time that you were going to allocate to your co-counsel? Only with the approval of co-counsel. Thank you. I know the time is running short. The probable cause issue, when it went on to the circuit court, Judge Jernigan had an extensive hearing on a motion to suppress the evidence. And again, the transcript of that hearing, I think, was 70 pages. And he wrote an extensive opinion. He talked about all these materiality issues concerning the exculpatory evidence and the fraudulent conduct and so forth. He listed 14 different things and explained in his opinion how he thought those were not meritorious. He found probable cause. He heard all the evidence in the trial and listened to motions for a directed verdict and overruled those motions, finding that there was probable cause. I want to mention quickly, I know counsel for Mr. Womack mentioned the Hinchman and the Dara cases from this court. Those were in 2002 and 2001. Judge Russell specifically called the validity of these opinions into question in light of Rayburg. Rayburg, of course, as the court knows, 2012, I believe, opinion from the United States Supreme Court. Grand jury witnesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has absolute immunity from Section 1983 claim based on the witness's testimony. This rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony  I believe that the Rayburg case pretty much brings this whole case to a halt. And, of course, the court applied it to the Sixth Circuit in the Vaughn v. Shaker Heights case. On the conspiracy issue, this case, in my mind, is very, very similar to this case of Jaquim v. Sams East Inc. I believe Judge Cole was on the panel of that case. And Judge Kennedy in that case wrote that the conspiracy that was being alleged in Jaquim was a pure fantasy. And I think it's a pure fantasy in this case. There was no conspiracy. There was no group of people. The big problem that Judge Russell had with this case was that no specific facts have been alleged to support the conclusory allegations that there was a conspiracy. And I think that's a major flaw in the case of the plaintiff. In fact, Maldawan, again involving two members of this panel in 2009, held that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations are unsupported by material facts will not be sufficient to state a claim under Section 1933. The opinion written by Judge Jernigan talks in detail about 14 of these allegedly material issues he found were not well supported and not well founded. Thank you. Thank you, Mr. Nunnery. Your Honors, I'm glad to talk about anything that the court would like to take up as far as what opposing counsel has brought up in their arguments. I will simply point out that as far as the arguments are concerned, they are mostly fact-based arguments. In fact, I think what I just heard was almost exclusively fact-based arguments. And if you pull those facts out of the opinion, that's fine. This would be great as a bench memo or a memorandum opinion if we were involved in a bench trial, but not on summary judgment. The question is, have we produced enough to go forward on the probable cause issue? Have we produced enough to go forward on the conspiracy issue? And I submit to the court that there's no question about it, simply for the evidence that we talked about before. And on the conspiracy claim specifically, that same window of facts, the narrow window of facts that happened on April the 9th, support the conspiracy claim in this case. The court states the proper standard from the Spadafore case on page 25, but then goes on to page 27 to apply a completely different standard. And that standard is that we must have direct knowledge of what happened in the phone call between Detective Conley and Ms. Knight. And we have to have direct knowledge of what the conspirators had discussed amongst each other. And that's precisely what the standard in Spadafore was designed to eliminate. The Spadafore standard recognizes that there are rare cases in which you will have a conspiracy that the plaintiff is going to be privy to. You're going to have to prove it via circumstantial evidence. And the direct knowledge of a conspiracy, that standard has never been required in any civil case decided by this court. And to my knowledge, in any court ever, it's never been used. The term direct knowledge doesn't appear in any Sixth Circuit case law. But in terms of what is the circumstantial evidence that we presented, aside from what we've already talked about, of a conspiracy, they put drugs into the hands of a convicted felon who's got a suspended driver's license. They asked her to drive to Mr. Womack's office in violation of their own orders and every tenet of good sense. And that's why I think it's so interesting that Mr. Nunnery would say that they took every measure to ensure the accuracy of the wire, every measure to ensure that Connie Knight was wired up, and yet somehow managed to lose the audio from the critical phone call from KSP. Not only that, but they completely failed to vet her background, or else they ignored it and decided to use her anyway, because this is not someone who would be appropriate to use as a confidential informant. So that's highly probative of a conspiracy here, highly probative of the idea that they were trying to do everything that they could possibly do to get Dax Womack on something. This confidential informant was on a fixed income. They pay her $300, which is three times the rate of the normal confidential informant, and neglect to mention that even when directly asked about it at the preliminary hearing of the grand jury. Even when directly asked that question, Matt Conley evades the answer, and we only find out about it when Connie Knight is deposed. Mr. Cannon, your time has expired. I think we have a pretty good sense of your arguments, and we very much appreciate them, and appreciate the arguments from other counsel who argued today. Thank you, Judge. Thank you very much. The case will be submitted.